**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

SYED TAHER,                                          )
                                                     )
                              Plaintiff,             )
v.                                                   )          **CIVIL ACTION**
                                                     )          **No. 06-2132-KHV**
WICHITA STATE UNIVERSITY,                            )
                                                     )
                              Defendant.             )
_____    )

## MEMORANDUM AND ORDER

Syed Taher sues Wichita State University ("WSU" or "the University") for employment discrimination, retaliation and hostile work environment under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. This matter comes before the Court on Defendant's Motion For Summary Judgment (Doc. #44) filed August 17, 2007. For reasons stated below, the Court sustains defendant's motion.

## I.    Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence. Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, 942

F.2d 737, 743 (10th Cir. 1991).  Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  The nonmoving party may not rest on his pleadings but must set forth specific facts.  Applied Genetics, 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment."  Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991).  Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative.  Anderson, 477 U.S. at 250-51.  "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial."  Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251-52.

"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e).  Rule 56(e) also requires that "copies of all papers or parts thereof referred to in an affidavit be attached thereto or served therewith."  To enforce this rule, the Court ordinarily does not strike affidavits but simply disregards those portions which are not shown to be based upon personal knowledge or otherwise do not

comply with Rule 56(e).  Maverick Paper Co. v. Omaha Paper Co., 18 F. Supp.2d 1232, 1234-35 (D. Kan. 1998).

## II.    Facts[1]

The following facts are either uncontroverted or, where controverted, construed in the light most favorable to plaintiff:

### A.    Plaintiff's Employment At WSU

Plaintiff, an Asian, is from Bangladesh.  He does not practice the Muslim religion, is not associated with a mosque and does not follow Muslim prayer routine.

In 1976, plaintiff began working as an assistant professor in the physics department of WSU. He is currently employed as associate professor of physics.  For some time, plaintiff has agreed to divide his responsibilities as follows: 70 per cent teaching, 20 per cent research and 10 per cent service.[2]

The chair of the physics department provides annual evaluations for each professor in the department.  The chair evaluates each professor on a 15 point scale for each of the three areas of responsibility and then weighs the numerical evaluations against the agreed division of emphasis for each professor.  Based on the results, the chair determines the amount of salary increase each professor should receive out of the pool of money available to the department for that fiscal year.[3]

---

[1]    The Court does not include facts which the record does not support, or facts which the parties include only in the argument section of their briefs and not in the statement of facts as required by D. Kan. Rule 56.1.

[2]    The physics department divides professor responsibilities into three categories: teaching, research and service.  Each professor agrees to a level of emphasis in each category.

[3]    The chair can choose between the following salary increase recommendations: none, low, average, above average and high.

The chair forwards the information to the dean of the college of liberal arts and sciences who may either accept the chair's recommendation or provide a raise from the dean's pool of funds.

On March 30, 2001, Dr. Hussein Hamdeh, chair of the physics department, evaluated plaintiff. Hamdeh found that plaintiff met expectations in all three categories, i.e. teaching, research and service, but did not recommend a salary increase. The dean increased plaintiff's salary by $4,137.[4]

On February 13, 2002, Dr. Pawan Kahol, the new chair of the physics department, evaluated plaintiff. Kahol found that plaintiff met expectations in all three categories, but also did not recommend a salary increase. The dean increased plaintiff's salary by $401.[5]

On February 17, 2003, Kahol found that plaintiff met expectations in all three categories and again made no recommendation for a salary increase. The dean increased plaintiff's salary by $670.

In the summer of 2003, Dr. Elizabeth Behrman was elected chair of the physics department.[6] While Behrman was chair, she received numerous student complaints about plaintiff. Specifically, students complained that plaintiff missed a final exam, did not keep office hours and was unavailable to meet outside of class.

In 2004, plaintiff applied for a full time graduate faculty position. In support of his application, plaintiff submitted a curriculum vitae ("CV") which misrepresented his publication record. Behrman, Hamdeh and James Ho, a physics professor, comprised the committee which

---

[4]     The record does not reveal who served as dean at that time. In June of 2001, Dr. William Bischoff became dean.

[5]     Although the record is not clear, it appears that the salary increase came from the dean's funds.

[6]     Behrman held this position until the spring of 2006.

reviewed plaintiff's application. Behrman became suspicious of plaintiff's CV and investigated its purported publications. She reported the issue to the dean, who also investigated the matter. The investigations revealed that plaintiff had misrepresented his record in three instances.[7] Due to questions regarding the CV, the committee tabled plaintiff's application for the graduate faculty position.

In early 2004, Charles Burdsal, psychology professor at WSU, told Behrman that since early in plaintiff's career at WSU, plaintiff was suspected of altering student review forms, known as Student Perceptions on Teaching Effectiveness ("SPTE") forms.[8] When Behrman reviewed plaintiff's SPTE forms from the fall semester of 2003, she noted evidence that plaintiff had submitted forms from previous semesters.[9]

---

[7]    Plaintiff represented that in 2000, he published an article in a Bangladesh atomic energy commission journal and cited a volume and page number of the publication. Bischoff determined that the paper had not been published and that no volume or page number existed. Bischoff concluded that the entry was an obvious misrepresentation of plaintiff's record, and plaintiff agreed to correct the CV to reflect that the article was "in press."

Plaintiff also listed two "Published Extracts of Papers Presented At Meetings" which were not actually published. BishcoId concluded that the entries misrepresented plaintiff's record, and plaintiff agreed to amend the CV to reflect that the extracts were not published.

In light of the misrepresentations, Bischoff concluded that from 2000 to 2003, plaintiff's merit raises probably exceeded his actual accomplishments.

[8]    Defendant's statement of facts states that Burdsal was chair of the mathematics department, see Defendant's Memorandum In Support Of Motion For Summary Judgment ("Defendant's Memorandum") (Doc. #45) filed August 17, 2007 at 20, ¶ 55, but Behrman's affidavit states that he is a psychology professor. See Affidavit Of Elisabeth Behrman ("Behrman Affidavit"), Exhibit D to Defendant's Memorandum (Doc. #45) at 3, ¶ 9.

[9]    Although the record is not clear, it appears that Behrman was looking at student review forms from the fall semester of 2003. Defendant's statement of facts does not reveal what evidence Behrman saw. See Defendant's Memorandum (Doc. #45) at 20, ¶ 55. Behrman's affidavit states that she was suspicious because the student comments were photocopies, not originals, and one student said that she was happy that the class had only quizzes and no test, but the class syllabus explicitly included exams. See Behrman Affidavit at 3, ¶ 11.

On February 10, 2004, plaintiff filed an internal grievance against Behrman and "previous physics chairs and appropriate WSU administrators."  Exhibit 3 to Affidavit Of William Bischoff, Exhibit C to Defendant's Memorandum (Doc. #45).  Under the heading "type of grievance," plaintiff listed the following:

> Discrimination in salary, working conditions, such as teaching loads and schedules.  Intimidation and haras[s]ment.

Id.[10]

On February 16, 2004, Behrman evaluated plaintiff's performance.  At the time, she was unaware of plaintiff's grievance.  Behrman found that plaintiff met expectations for service, but not teaching and research.[11]  Behrman commented as follows:

> **Teaching.** * * *  I have reservations about the [SPTE] written comments: though they are uniformly positive in tone, they are all xeroxes, not originals; this although the SPTE %ile sheet he attaches is the original.  Moreover one of the comments made is that the student is happy that there are "quizzes only and no tests," while the corresponding syllabus . . . explicitly includes an exam.  I infer that the comment sheets attached were not in fact from this course at all.  Also, during that semester I received many serious complaints from students about his teaching including a multiply-signed letter from five of his current and previous students.  This letter, whose signers are all serious students, physics majors whose opinions we respect, charges that his teaching is incompetent in many respects. * * *
>
> **Research.** * * * His co-authors to the first paper inform me that his contribution consisted of his providing money to fund the research from his own private funds.  This kind of contribution belongs more properly in the "acknowledgments" section, not as co-authorship.  In any case such a contribution does not count for purposes of research performance.  The second paper is not a physics paper at all, but a Pakistani medical technology paper studying the statistics of blood pressure, cholesterol and heart attacks.  It is not clear what if any his contribution to this paper was.  To the best of our knowledge, he has never done any research in his laboratory.  Because no one ever goes into his lab a leak went undiscovered until the entire basement was

---

[10]   Exhibit 3 contains only the first page of the grievance.  On the form, plaintiff indicated that he had attached statements regarding the events and/or actions which formed the bases of his grievance.  Those documents (if any) are not part of the record in this case.

[11]   This was the first time in 28 years that plaintiff received an unsatisfactory evaluation.

6

awash in water, ruining several tens of thousands of dollars worth of equipment belonging to other researchers.   In addition, during 2003 he made serious misrepresentations of his research record on his application for full membership in the graduate faculty.  * * *

Exhibit 5 to <u>Behrman Affidavit</u>.[12]   Behrman recommended no salary increase.   Despite the recommendation, the dean raised plaintiff's salary by $850.

Plaintiff contends that the evaluation of February 16, 2004 rejected evidence of his good teaching research and service.[13]  Plaintiff also contends that the evaluation was false, in (1) blaming him for destroying thousands of dollars worth of equipment through a plumbing leak; (2) calling one of his papers a "general science" and not a "physics" publication; (3) accusing him of not contributing to a paper to which he did contribute; and (4) claiming that his student comment sheets were inauthentic.  <u>See</u> <u>Affidavit Of Syed Taher</u> ¶ 3.

On February 26, 2004, the University grievance committee received plaintiff's grievance of February 10, 2004.

On March 29, 2004, plaintiff amended the attachments to his grievance.  Plaintiff complained of a pattern of discrimination and harassment dating back to the 1990s, stating that he had been "singled out and targeted." Exhibit 3 to <u>Bischoff Affidavit</u>.  Plaintiff provided a detailed and lengthy narration of, <u>inter alia</u>, the following events: (1) WSU regularly assigned him the heaviest teaching loads and worst time schedules; (2) WSU gave him an old computer and printer and denied him secretarial assistance; (3) Behrman unfairly subjected him to greater scrutiny with respect to his graduate faculty application and his performance review; (4) WSU paid him the lowest salary in the

---

[12]      Although Behrman stated that the misrepresentations occurred in 2003, her affidavit states that they occurred in 2004.  <u>See</u> <u>Behrman Affidavit</u> at 2, ¶ 7.

[13]      Plaintiff does not identify the evidence to which refers.

department; and (5) the physics department formula for recommending merit raises was one of "discrimination and favoritism." Plaintiff did not allege that the discrimination and harassment was based on race, religion, national origin, or any other illegal motive. He did, however, ask that the rules committee include "a senior member either from the international or from ethnic minority faculty." Id.

On April 10, 2004, Behrman cut plaintiff's research supply allocation in half. Plaintiff contends that she did so in retaliation for his grievance of February 10, 2004. Behrman does not specifically recall the cut but believes it must have been pursuant to WSU policy which cuts allocations for any given fiscal year if they are not used by April or May. Plaintiff does not dispute the policy, but contends that the cut was retaliatory.

In April of 2004, a student complained that plaintiff had passed out a stack of papers which included student grades. Because this was a potential violation of the Family Education Rights and Privacy Act ("FERPA"), Behrman sent plaintiff an e-mail regarding the incident. Plaintiff did not respond. On the morning of April 29, 2004, Behrman telephoned plaintiff to discuss the matter. Plaintiff was too busy to talk. Behrman visited plaintiff's class at 8:30 a.m. to talk about the incident. The parties dispute what happened next. Defendant contends that Behrman sat quietly at the back of the class and plaintiff confronted her and left the class without discussing the matter. Defendant contends that Behrman attempted to discuss the grade sheet with the students, but they were unwilling to talk. Plaintiff contends that Behrman belittled him in front of his students and took over the class. Affidavit Of Syed Taher ¶ 4. Plaintiff left the room to call the assistant dean or assistant vice-president. When he returned, Behrman was gone.

On May 14, 2004, the grievance committee issued a report regarding plaintiff's grievance.

The report stated, <u>inter alia</u>, as follows:

> * * * There appear to have been at least 8 to 10 years of turmoil in the WSU Physics Department. Several faculty members used words like "dysfunctional" and "dead" to describe the current situation. . . . Primary difficulties in the department appear to result from poor communication and an unwillingness of members to promote department goals over personal goals. A severe political division has developed within the department which has resulted in members perceiving motives against them when actions are taken, such as class assignments, teaching loads, and faculty evaluations. Recently the problem has been accentuated by department members moving out of the department into administrative positions (graduate school), other programs (honors), and major university service[], with the result that their absence reduces the possibility of collegial contact within the department. The words, emotions and actions of individuals in this case have to be evaluated within this context. * * *

> In regard to teaching load, the Committee found that Professor Taher's load is heavy but is not out of line . . . . * * *

> * * * The Committee recognizes that Professor Taher's salary appears low when compared to other Associate Professors . . . . The salary grievance appears to be supported and needs attention.

> As for the claim that Dr. Behrman, the current Chair, has singled out Professor Taher and is treating him differently than others in the department, the Committee felt that her 03 Annual Evaluation of Professor Taher was harsh and extreme, and did not follow departmental guidelines, especially in assigning him a zero in teaching and research. The 03 evaluation needs to be considered without prejudice. Previous Chairs stated in the hearing that it would be impossible to be assigned a zero in teaching and/or research. In the matter of the four missing research documents reported in his vita presented to the Graduate School that Dr. Behrman could not find on-line, instead of going first to Professor Taher and asking him for clarification, she went directly to the Dean . . . suggesting fraud. When the Committee considered Professor Taher's explanation it found sloppy scholarship, but not conclusive evidence of fraud. Also, there was a recent incident where Professor Behrman came into one of Professor Taher's classes and accused him of releasing a class list that included student names with their grades. Her accusation was not substantiated by the students. Her action was unfortunate and inappropriate and was interpreted by Professor Taher as further evidence of the Chair's harsh and extreme treatment.

> Professor Taher believes the Chair has an agenda to force him out. The Committee could not come to a consensus on this point. Some felt this might be an agenda. Others felt that the evidence points to an alternative explanation; Dr. Behrman took on the Chairmanship at the strong behest of others and perhaps should not have. The

job is hard enough in relatively peaceful departments. She has other stressful duties associated with the Senate presidency, which create pressure and overwork conditions that might explain some overreactions, although it doesn't justify them. She needs to work seriously on the skills needed in personal management. * * *

Exhibit 4 to <u>Bischoff Affidavit</u>.[14]

On August 10, 2004, Behrman blocked plaintiff's graduate membership application.[15] On the same day, Behrman assigned plaintiff the heaviest teaching assignments and the worst teaching schedules in the department.[16]

During a faculty meeting on August 26, 2004, Behrman snapped at plaintiff and belittled him with critical and disparaging remarks in a very loud and angry voice.[17] Behrman had never snapped in a faculty meeting before, and no department chair had ever treated plaintiff in such a manner. Behrman remembers being upset by plaintiff's behavior toward a new faculty member, Dr. Waldemar Axmann. Plaintiff said that the new member could not attend faculty meetings until

---

[14]    The parties do not discuss the grievance committee report. The Court, however, finds it helpful in the context of their factual assertions.

[15]    Plaintiff contends that Behrman blocked the application based on unsubstantiated allegations which were dismissed earlier by the 2004 university grievance committee. Plaintiff does not identify the unsubstantiated allegations to which he refers. See <u>Response To Defendant's Motion For Summary Judgment</u> ("<u>Plaintiff's Response</u>") (Doc. #51) filed September 21, 2007 at 7, ¶ 7. Plaintiff, however, does not dispute that the CV which he submitted in support of his application misrepresented his publication record. Moreover, plaintiff does not dispute that the committee tabled his application after it learned that his CV contained misrepresentations, and plaintiff did not submit another application. See <u>Defendant's Memorandum</u> (Doc. #45) at 22, ¶ 62; <u>Plaintiff's Response</u> (Doc. #51) at 5, ¶ 62.

[16]    Defendant counters plaintiff's assertion with information regarding credit hours, head count and student credit hours for each professor for each semester from the fall of 2000 to the spring of 2005. See <u>Defendant's Memorandum</u> (Doc. #151) at 25-31. This information, however, sheds no light on which professors taught the most difficult courses and which professors had the worst teaching schedules.

[17]    The record does not reveal Behrman's exact statements.

existing faculty voted to confer him the right.  Behrman told plaintiff that the new member had every

right to be there and that if plaintiff had a problem with it, he could take it up with the dean.

On September 9, 2004, the entire physics faculty attended a meeting and agreed that

Behrman would visit all classes.

On September 30, 2004, Behrman revised her evaluation of plaintiff for 2003.  Behrman

found that plaintiff met expectations in service, but not teaching or research.  Behrman raised

plaintiff's teaching score from 0 to 4 (out of 15) and his research score from 0 to 3 (out of 15).

Behrman recommended no salary increase.[18]

On October 10, 2004, Behrman made an unannounced visit to plaintiff's class.  Plaintiff

noticed students looking at Behrman and commenting about her presence.  He walked back to where

she was sitting and asked to speak with her.  Behrman refused.  Plaintiff replied, "I'm going to leave

or let me teach the class."  Behrman left the class.  Plaintiff asserts that Behrman was critical of him

and belittled him before his students.  Plaintiff contends that as Behrman was leaving, she said,

"He's [an] asshole."  Taher Depo. at 285:13-17.

During the fall of 2004, Behrman visited the classes of five other physics professors.  To

some classes, she went unannounced and to others, she spoke with the professors beforehand.

Plaintiff is the only professor who confronted Behrman or threw her out of class.

On October 15, 2004, plaintiff filed a second grievance complaining of "discriminations,

harassments and retaliation" by Behrman.[19]  Exhibit 3 to Bischoff Affidavit.  Plaintiff complained,

---

[18]     It appears that plaintiff's salary did not change after the revised evaluation.

[19]     The parties agree that plaintiff filed the second grievance on October 15, 2004, but
the grievance form is dated November 8, 2004.  See Exhibit 3 to Bischoff Affidavit.  The record
does not explain this disparity.  The record also does not reveal the outcome of the second grievance.

11

inter alia, that Behrman (1) disrupted his class with a surprise visit on October 6, 2004; (2) snapped

at him and made disparaging remarks in a faculty meeting on August 26, 2004; (3) excluded him

from an e-mail to faculty on making purchases before a cut-off date; (4) allocated him the least

research funds; (5) deprived him of secretarial help; (6) solicited student complaints about him; (7)

blocked his graduate membership with false accusations and innuendoes; (8) assigned him the

heaviest teaching loads and worst schedules; and (9) exhibited prejudice in her revised evaluation

of September 30, 2004.  Plaintiff did not complain that Behrman's actions were based on race,

religion, national origin or any other illegal motive.

In 2004, the physics department decided to give assessment tests in all introductory physics

courses.  The department hired a student to administer the tests, and each professor could decide

when to give them.  Plaintiff originally chose the last week of class, but later changed the date to

December 13, 2004, the day of the final exam.[20]  The student administrator had a conflict, so

Behrman agreed to administer the test to plaintiff's class.[21]  Plaintiff had not indicated whether he

wanted to give the assessment test before or after the final exam.  Behrman arrived ten minutes

early.  When plaintiff did not arrive on time, she assumed that he wanted to give the assessment test

before the final exam.  After Behrman passed out the assessment test, plaintiff arrived.  He told the

students that they could go unless they wanted to take the assessment test.  Plaintiff contends that

Behrman had come unannounced, taken over the class, disrupted the final and "belittled plaintiff in

---

[20]     The record is unclear whether the final exam was on December 13 or 15.  Compare Defendant's Memorandum (Doc. #45) at 18, ¶ 45 with Plaintiff's Response (Doc. #51) at 4, ¶ 46 and 8, ¶ 17.  In ruling on defendant's motion for summary judgment, the Court accepts plaintiff's assertion that the exam was on December 13.

[21]     Behrman was the only member of the assessment committee who did not have a conflict on December 13.

front of the students by passing remarks in plaintiff's absence." Plaintiff's Response (Doc. #51) at 8, ¶ 17.

In December of 2004, plaintiff failed to show up for a final exam.  He claimed that he missed the exam due to a road hazard or problems with his car.

On December 22, 2004, Behrman received two student complaints regarding plaintiff.  One complained that she could not contact plaintiff during his office hours throughout the fall semester and that he did not show up for the final exam.  Another complained that plaintiff had figured his grade incorrectly and did not respond to his e-mail.  Behrman reported the complaints to the dean.[22]  Behrman did not report the incidents to plaintiff during the fall semester.

On January 11, 2005, Behrman reported to the dean that students had problems with their grades in plaintiff's spring physics 214 class.[23]

On February 22, 2005, Behrman reviewed plaintiff's performance.  She found that he met expectations in research and service, but not teaching.  Behrman commented as follows:

> **Teaching.** * * * Dr. Taher refused to post office hours spring semester, as required by Policies and Procedures, and in fall semester did not post till [sic] mid-October though reminded that it is University policy to do so many times.  Even after he posted his office hours he rarely observed them; I have documented six times in late October-November when students came to the Physics Office looking for him during his office hours but he was nowhere to be found.  Chair's observations of his classes, and from talking with many of his students: I observed his teaching for five minutes of one class, during which he was disorganized, ill prepared, and clearly had no idea

---

[22]  Plaintiff contends that Behrman's statements to the dean were false, but he does not dispute that Behrman received the student complaints.  See Defendant's Memorandum (Doc. #45) at 22-23, ¶ 65(a) and (b); Plaintiff's Response (Doc. #51) at 5, ¶ 65.

[23]  Plaintiff contends that the report was false, but he does not dispute that after the *fall* semester, Behrman received an e-mail and other complaints regarding grades in his physics 214 class.  See Defendant's Memorandum (Doc. #45) at 23, ¶ 66(b); Plaintiff's Response (Doc. #51) at 5, ¶ 66.  Thus, it appears that the report may have been false only to the extent it reported that the problems were with respect the spring class, as opposed to the fall class.

how to answer the students' questions.  After five minutes he noticed that I was sitting quietly in the back, walked over, and threw me out.  His students often come to complain of his unavailability, inability to answer questions, and lack of preparation for class; most of them say, however, that he is a nice guy. * * *

Exhibit 5 to Behrman Affidavit.[24]  Behrman recommended no salary increase.  The University raised plaintiff's salary by $568.

In 2005, due to conflict in the department, the physics faculty provided numerical evaluations for each other, but did not make salary recommendations.  The department faculty rated plaintiff lowest in research and service, but second to highest in teaching.  The faculty would not have known about student complaints which Behrman received, or that plaintiff missed a final exam.

On March 23, 2005, plaintiff filed a complaint with the Kansas Human Rights Commission ("KHRC"), marking boxes to indicate that WSU had discriminated against him on the basis of race, religion and national origin.  See Exhibit B to Defendant's Memorandum (Doc. #45).  Plaintiff charged that Behrman made unwarranted critical reviews of his performance, assigned him excessive work, criticized his performance in front of students, and denied him pay raises.  See id.[25] Plaintiff did not complain that Behrman had retaliated against him.  Plaintiff did not mark the box for retaliation, and he did not mention retaliation in his interview with the KHRC investigator.

_____

[24]     Plaintiff contends that Behrman's review rejected evidence of his superior teaching, research and service.  Plaintiff, however, does not identify the evidence to which he refers.

[25]     More specifically, plaintiff complained of the following incidents: (1) on September 30, 2004, in her revised evaluation, Behrman was harsh and extreme and made unwarranted critical reviews of his performance; (2) on October 8, 2004, Behrman visited his class unannounced to intimidate him and criticize his performance before the class; (3) on October 22, 2004, Behrman solicited students to complain about him; (4) on November 15, 2004, plaintiff learned that Behrman did not give the dean his response to her review or February 16, 2004; (5) on December 15, 2004, Behrman ignored plaintiff's application for a summer teaching position; (6) in the spring of 2005, Behrman assigned plaintiff excessive work and the worst teaching schedule; and (7) on February 21, 2005, Behrman unfairly reviewed his performance.  See id.

14

On September 9, 2005, Behrman accused plaintiff of possessing keys of other faculty offices and illegally taking a computer from the office of another professor. After the professor had left the University, plaintiff borrowed some keys and helped himself to the professor's old computer. When Behrman learned that the computer was missing, she inquired in the department. Plaintiff responded that he needed the computer. Behrman was okay with plaintiff having the computer if he needed it, but she objected to him having keys to other offices or labs and taking the computer without asking. WSU took no corrective or disciplinary action, however, as a result of the incident.

On December 1, 2005, after investigation, the KHRC issued a determination of no probable cause regarding plaintiff's complaint. Plaintiff subsequently filed a charge with the Equal Employment Opportunity Commission ("EEOC"), which adopted the KHRC finding.

On December 6, 2005, plaintiff filed a third grievance against Behrman, complaining of "[h]arassments [sic] and malice in the work place, unjustifiably low raise in salary, [and] denial of summer appointment to teach." Exhibit 3 to Bischoff Affidavit. Plaintiff complained, inter alia, that Behrman (1) disrupted his final exam by giving the assessment test before the students took the final; (2) ignored his application to teach in the summer; (3) gave him the heaviest teaching load and worst schedule; and (4) accused him of taking a former professor's computer. Plaintiff asked the grievance committee to stop Behrman from harassing him and interfering with his teaching. Plaintiff did not complain that Behrman's actions were motivated by race, religion or national origin.

On January 26, 2006, the EEOC issued plaintiff a right to sue letter.

On January 30, 2006, Behrman e-mailed plaintiff that she had tried to visit him during office hours but he was not there.[26] Behrman reminded plaintiff that he was responsible to post and keep

---

[26]     Plaintiff contends that he did not have office hours scheduled for that time.

office hours, but took no corrective or disciplinary actions as result of the incident.

On February 16, 2006, Behrman found that plaintiff met expectations in service, research and teaching.  The evaluation form did not include a place for salary recommendation,[27] but the dean raised plaintiff's salary by $585.

On April 10, 2006, plaintiff filed this lawsuit.

Plaintiff has never heard (or heard of) Behrman making improper or disparaging remarks (or remarks of any kind) about people of Asian descent, people from Bangladesh, people of Middle Eastern descent or people of the Muslim faith.

## B.    Other Professors

### 1.    Dr. Hussain Hamdeh

Hamdeh, an Asian, is from India.  He served as chair of the physics department from 1999 through 2001 and currently serves as interim chair.

In 2002, Kahol found that Hamdeh met expectations in all three categories but did not make a salary recommendation.  The University raised his salary by $950.

In 2003, Kahol found that Hamdeh met expectations in all three categories and recommended an "above average" salary increase.  The University raised Hamdeh's salary by $950.

In 2004, Behrman found that Hamdeh met expectations in all three categories and recommended an "above average" salary increase.  The University raised Hamdeh's salary by $3,955.

In 2005, Behrman found that Hamdeh met expectations in all three categories and recommended an "above average" salary increase.  The University raised Hamdeh's salary by

---

[27]    Plaintiff contends that Behrman was critical of his activities and "marginalized them to having little merit."  Plaintiff's Response (Doc. #51) at 8, ¶ 19.

$1,700.

In 2006, Behrman found that Hamdeh met expectations in all three categories.   The evaluation form did not include a place for salary recommendation.  The University raised Hamdeh's salary by $12,397.

### 2.      Dr. James Ho

Dr. James Ho, an Asian, is from China.  Ho has worked at WSU since 1985 and currently serves as distinguished physics professor.

In 2001, Hamdeh found that Ho met expectations in all three categories.  The evaluation form did not include a place for salary recommendation.  The University raised Ho's salary by $2,628.

In 2002, Kahol found that Ho met expectations in all three categories and did not make a salary recommendation.  The University raised Ho's salary by $493.

In 2003, Kahol found that Ho met expectations in all three categories and recommended an "average" salary increase.  The University raised Ho's salary by $725.

In 2004, Behrman found that Ho met expectations in all three categories and recommended an "above average" salary increase.  The University raised Ho's salary by $2,540.

In 2005, Behrman found that Ho met expectations in all three categories and recommended a "high" salary increase.  The University raised Ho's salary by $7,800.

In 2006, Behrman found that Ho met expectations in all three categories.  The evaluation form did not include a place for salary recommendation.  The University raised Ho's salary by $2,935.

### 3.      Dr. Jason Ferguson

Dr. Jason Ferguson, a Caucasian, is from the United States.  He has worked at WSU since 2001 and currently serves as associate physics professor and faculty coordinator for the high performance computing center.

In 2002, Kahol found that Ferguson met expectations in all three categories, but made no salary recommendation.  The University raised his salary by $1,812.

In 2003, Kahol found that Ferguson met expectations in all three categories and recommended an "average" salary increase.  The University raised his salary by $1,350.

In 2004, Behrman found that Ferguson met expectations in all three categories and recommended an "average" salary increase.[28]  The University raised his salary by $2,760.

In 2005, Behrman found that Ferguson met expectations in all three categories and recommended an "average" salary increase.[29]  The University raised his salary by $1,580.

In 2006, Behrman found that Ferguson met expectations in all three categories.  The evaluation form did not include a place for salary recommendation.  The University raised his salary by $5,707.

### 4.      Dr. Donald Foster

Dr. Donald Foster, a Caucasian, is from the United States.  Foster worked as a physics professor at WSU from 1985 to 2005, and served as chair of the physics department from

---

[28]       That year, Ferguson received excellent comments from his students and the most research grant money in the department ($249,621).  Ferguson also presented at ten national/international conferences, one regional conference and one external colloquium.

[29]       That year, Ferguson published a refereed article in <u>Physical Review Letters</u>, the top physics journal, and his SPTE scores improved dramatically.  He also received two continuing research grants totaling $512,772, by far the most money received in the department.

1985 through 1990 and interim chair in 1994.  Foster retired on May 15, 2005.

On February 10, 2004, Behrman found that Foster met expectations in teaching, research and service and recommended a "low" salary increase.  The University raised his salary by $520.[30]

### 5.    Dr. Pawan Kahol

Kahol, an Asian, is from India.  WSU employed Kahol as a physics professor from 1989 through 2005.  He served as chair of the department in 2002 and 2003.

In 2001, Hamdeh found that Kahol met expectations in all three categories.  The evaluation form did not include a place for salary recommendation.  The University raised Kahol's salary by $10,724.[31]

## II.    Analysis

Plaintiff claims that (1) because of race, defendant paid him a low salary; (2) because he complained of national origin discrimination, defendant retaliated against him with undisclosed adverse action; and (3) because he complained of national origin discrimination, defendant retaliated against him by subjecting him to a hostile work environment.[32]  See Pretrial Order (Doc. #43) at 11-12.  Defendant seeks summary judgment on all claims.  Regarding discrimination, defendant asserts that as a matter of law (1) plaintiff's claim is limited to events which happened within 300 days of

---

[30]    The record does not contain information regarding performance reviews and/or salary increases for Foster in other years.

[31]    The record does not contain information regarding Kahol's reviews and/or salary increases after 2001.

[32]    In their briefs, both parties treat the hostile work environment as a free standing claim, i.e. not part of the retaliation claim.  Defendant seeks summary judgment on such claim on grounds that as a matter of law (1) plaintiff cannot show a sufficiently severe or pervasive hostile work environment; and (2) plaintiff cannot show that the alleged conduct was because of race.  See Defendant's Memorandum (Doc.#45) at 42-47.

his KHRC complaint; and (2) plaintiff cannot establish a prima facie case.[33]  Regarding retaliation, defendant also asserts that as a matter of law (1) plaintiff did not exhaust administrative remedies; and (2) plaintiff cannot establish a prima facie case.

### A.   Salary Discrimination

#### 1.   Claim Limited To Decisions Made On Or After May 27, 2004

Defendant contends that under Ledbetter v. Goodyear Tire & Rubber Co., ___ U.S. ___, 127 S. Ct. 2162 (May 29, 2007), plaintiff's discrimination claim is limited to pay decisions made within 300 days of filing his KHRC charge, i.e. pay decisions made on or after May 27, 2004. In Ledbetter, the United States Supreme Court held that a discriminatory pay claimant must file an administrative charge within the statutory time period, in this case 300 days, from the date of the alleged discriminatory act.[34]  There, plaintiff alleged that she had been the victim of pay discrimination, and that defendant had carried forward the effects of the past discrimination with each paycheck and through recent pay decisions which utilized non-discriminatory criteria.  The Supreme Court rejected plaintiff's arguments, finding that plaintiff had to base her claim on discrete pay-setting decisions which occurred during the time period for filing an administrative charge.  See id., 127 S. Ct. at 2165-72.  In other words, the Supreme Court found that plaintiff must base her claim on intentionally discriminatory conduct which occurred during the charging period, and not on neutral conduct which merely gave effect to discriminatory conduct outside the charging period. See id. at 2169-70.

---

[33]     Defendant does not argue that plaintiff cannot establish pretext.

[34]     In a deferral state such as Kansas, a Title VII claimant must file an administrative discrimination charge within 300 days of the alleged unlawful act.  See Peterson v. City of Wichita, 888 F.2d 1307, 1308 (10th Cir. 1989) (applying 42 U.S.C. § 2000e-5(f)(1)).

In light of <u>Ledbetter</u>, plaintiff agrees to abandon any claims which relate to pay decisions prior to May 27, 2004.  <u>See</u> <u>Plaintiff's Response</u> (Doc. #51) at 11 n.1.  Accordingly, plaintiff's discrimination claims are limited to claims relating to pay decisions made on or after May 27, 2004.

The record contains the following potential pay-setting decisions on or after May 27, 2004: (1) Behrman's re-evaluation of plaintiff's performance on September 30, 2004; (2) Behrman's review of plaintiff's performance on February 22, 2005; and (3) Behrman's review of plaintiff's performance on February 16, 2006.[35]  Any pay decision based on the third review, however, appears to be barred by plaintiff's failure to exhaust administrative remedies.  In <u>Martinez v. Potter</u>, 347 F.3d 1208, 1210-11 (10th Cir. 2003), the Tenth Circuit found that a Title VII claimant must file a separate administrative complaint for discrete acts of discrimination which occur after the filing of an administrative complaint.  Here, plaintiff filed her administrative complaint on March 23, 2005, and the third performance review occurred almost a year later, on February 16, 2006.  Because plaintiff did not file a separate administrative complaint regarding the third review, any discrimination claim based on the third review is barred by failure to exhaust.  <u>See</u> <u>id.</u>  Accordingly, plaintiff's discrimination claim is limited pay decisions based on (1) Behrman's re-evaluation of plaintiff's performance on September 30, 2004; and (2) Behrman's review of plaintiff's performance on February 22, 2005.

### 2. Prima Facie Case

Defendant contends that plaintiff cannot establish a prima facie case of discrimination.  Under Title VII, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

---

[35]     For purposes of defendant's motion for summary judgment, the Court assumes that Behrman's reviews had a direct impact on defendant's pay decisions regarding plaintiff.

individual's . . . race . . . ."  42 U.S.C. § 2000e-2(a)(2).  Plaintiff bears the initial burden to make a prima facie showing of discrimination.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  If plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a facially nondiscriminatory reason for its actions.  See Reynolds v. Sch. Dist. No. 1, Denver, Colo., 69 F.3d 1523, 1533 (10th Cir. 1995).  If defendant articulates a legitimate nondiscriminatory reason, the burden shifts back to plaintiff to present evidence from which a reasonable jury might conclude that defendant's proffered reason is pretextual, that is, "unworthy of belief."  Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1165 (10th Cir. 1998) (quoting Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir. 1995)).

To establish a prima facie case of pay discrimination, plaintiff must show that he was paid less, or given a lesser pay raise, than similarly situated employees of different races.  See Amro v. Boeing Co., 232 F.3d 790, 798 (10th Cir. 2000).  Plaintiff bears the burden to show that he is similarly situated to the employees with whom he is comparing himself.  See Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 532 (10th Cir. 1994).

Defendant asserts that plaintiff cannot establish a prima facie case because even though Behrman recommended that he receive no pay increase, the University actually increased his pay. See Defendant's Memorandum (Doc. #45) at 37.  Defendant argues that a salary increase does not constitute adverse action and therefore plaintiff cannot establish a prima facie case.  See id.  The issue, however, is not whether plaintiff received *any* pay raise but whether he received a lesser raise than similarly situated employees of different races.  See, e.g., Amro, 232 F.3d at 798.[36]  Defendant

---

[36]    In Amro, the Tenth Circuit noted that a Title VII plaintiff can satisfy the fourth element of a prima facie case in a number of ways.  See id. at 796-97.  In the context of pay discrimination, the Tenth Circuit required that plaintiff show that he was paid less or given a lesser

(continued...)

has not shown that plaintiff's claim is precluded by the mere fact that he received a pay raise.

Defendant argues that plaintiff cannot show that it treated him differently than similarly situated professors.  In response, plaintiff asserts that after Behrman became chair, she drastically increased his work load, but not the work loads of Foster and Ferguson, and that such action demonstrates the control which Behrman exercised over plaintiff.  See Plaintiff's Response (Doc. #51) at 13.  Plaintiff's argument misses the boat.  The fact that Behrman may have assigned plaintiff a heavier work load does not show that she discriminated against him with respect to pay.[37] Plaintiff must show that Behrman's evaluations caused him to receive lower pay raises than similarly situated professors of different races.  See Amro, 232 F.3d at 798.  Plaintiff makes no attempt to do so.  Plaintiff conclusively states that he was similarly situated to Foster and Ferguson, but he cites no facts to support his conclusion.  See Plaintiff's Response (Doc. #51) at 13.

The Court's own review of the facts demonstrates that plaintiff cannot establish a genuine issue of material fact that he was similarly situated to Foster or Ferguson.  Foster retired on May 15, 2005.  In February of 2004, Behrman found that Foster met expectations, recommended a "low" salary increase and the University raised his salary by $520.  For the same year, Behrman recommended no salary increase for plaintiff, but the University raised his salary by $850.  These facts do not raise a genuine issue of material fact whether defendant treated Foster more favorably.

In 2004 and 2005, Behrman found that Ferguson met expectations in all three categories and

---

[36](...continued)
raise than other similarly situated non-protected class employees.  See id. at 798.

[37]    To the extent plaintiff is attempting to assert a claim for discriminatory work assignments, he waived any such claim by not including it in the pretrial order.  See Balfour v. Medicalodges, Inc., No. 05-2086-KHV, 2006 WL 3760410, at *23 n.46 (D. Kan. Dec. 19, 2006) (citing Wilson v. Muckala, 303 F.3d 1207, 1215 (10th Cir. 2002)).

recommended "average" salary increases.  The University raised Ferguson's salary by $2,760 and

$1,580, respectively, while plaintiff received raises of $850 and $568.  In 2004, Ferguson received

excellent comments from his students, the most research grant money in the department ($249,621),

and presented at ten national/international conferences, one regional conference and one external

colloquium.  In 2005, Ferguson, published a refereed article in <u>Physical Review Letters</u>, the top

physics journal, his SPTE scores improved dramatically, and he received two continuing research

grants totaling $512,772, by far the most money received in the department.  Other than his own

subjective opinion that Behrman rejected evidence of his "superior" teaching, research and service,

plaintiff presents no evidence regarding his own publication or research grant record during the same

period.  On this record, plaintiff has not raised a genuine issue of material fact that he was similarly

situated to Ferguson.  <u>See</u>, <u>e.g.</u>, <u>Somoza v. Univ. of Denver</u>, No. 05-CV355-PAC-BNB, 2006 WL

2535092, at **14-15 (D. Colo. Aug. 31, 2006).

Plaintiff has not established a genuine issue of material fact whether defendant gave higher

pay raises to similarly situated employees of other races.  Defendant is therefore entitled to summary

judgment on plaintiff's discriminatory pay claim.

**B.      Retaliation**

Plaintiff claims that because he complained about disparate pay due to his national origin,

defendant retaliated against him by undisclosed adverse action and subjecting him to a hostile work

environment.  <u>See</u> <u>Pretrial Order</u> (Doc. #43) at 11-12.  Defendant asserts that it is entitled to

summary judgment because (1) plaintiff did not exhaust administrative remedies; and (2) plaintiff

cannot establish a prima facie case of retaliation.

### 1.     Exhaustion Of Administrative Remedies

Exhaustion of administrative remedies is a jurisdictional prerequisite to suit under Title VII.  See Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999).  To exhaust administrative remedies, a plaintiff generally must present his claims to the EEOC or authorized state agency as part of his administrative charge and receive a right-to-sue letter based on that charge.  See id.   The charge "shall be in writing and signed and shall be verified," 29 C.F.R. § 1601.9, and must at a minimum identify the parties and "describe generally the action or practices complained of," 29 C.F.R. § 1601.12(b).  The charge tells the EEOC or KHRC what to investigate, provides it the opportunity to conciliate the claim, and gives the charged party notice of the alleged violation.  See Seymore v. Shawver & Sons, Inc., 111 F.3d 794, 799 (10th Cir. 1997).  Generally, the failure to mark a particular box on the administrative complaint form creates a presumption that the charging party is not asserting claims represented by that box.  See Gunnell v. Utah Valley State Coll., 152 F.3d 1253, 1260 (10th Cir. 1998).  The presumption may be rebutted, however, if the text of the charge clearly sets forth the basis of the claim.  See id.

Defendant asserts that plaintiff did not exhaust administrative remedies on his retaliation claim because he did not mark the box for retaliation or mention retaliation in his KHRC complaint.  In Belcher v. Boeing Commercial Airplane Group, 105 Fed. Appx. 222, 227 (10th Cir. 2004), the Tenth Circuit affirmed summary judgment for failure to exhaust where plaintiff marked the box for racial discrimination, but not the boxes for retaliation and disability discrimination.  The Tenth Circuit noted that in the narrative portion of the administrative complaint, plaintiff wrote nothing which suggested retaliation or disability discrimination.  On that record, the Tenth Circuit found that

25

plaintiff had presented no competent evidence that he had exhausted administrative remedies with respect to retaliation and disability discrimination.  See id.

Here, plaintiff marked the boxes for race, religion and national origin discrimination, but did not mark the box for retaliation.  Moreover, in the narrative portion of the administrative complaint, plaintiff did not suggest retaliation.  Plaintiff complained that on account of his race, religion and national origin, his supervisor "made unwarranted critical reviews of [his] performance, burdened [him] with excessive work assignments, criticized [his] performance in the presence of [his] students, and denied [his] pay raises." Exhibit B to Defendant's Memorandum (Doc. #45).[38]  On this record, plaintiff has not shown that he has exhausted administrative remedies with respect to his retaliation claims.  See Belcher, 105 Fed. Appx. at 227.  Defendant is therefore entitled to summary judgment on such claims.

### 2.    Prima Facie Case

Even if plaintiff had exhausted administrative remedies on his retaliation claims, defendant would be entitled to summary judgment because plaintiff has not established a genuine

---

[38]    Plaintiff did state that he complained to administration without success, but he did not allege that retaliation resulted from that complaint.  See id.

Exhibit B contains part of what appears to be a KHRC questionnaire (but does not include the first page(s) of the document).  Question 4 instructs the complainant to list all dates on which he feels he has had been discriminated against.  Plaintiff complained of the following: (1) Behrman's revised evaluation of September 30, 2004 was "prejudiced, harsh and extreme"; (2) on October 8, 2004, Behrman disrupted his class, intimidated him and criticized his performance in front of the class; (3) on October 22, 2004, Behrman solicited students to complain about him; (4) on November 15, 2004, plaintiff learned that Behrman did not inform the dean of plaintiff's response to her evaluation; (5) on December 15, 2004, Behrman ignored his application for a summer teaching position; (6) on January 17, 2005, Behrman burdened him with excessive work assignments and the worst teaching schedule; and (4) in her evaluation of February 21, 2005, Behrman continued her "harassment and bias" against him with a negative and critical review.  Id.

issue of material fact whether he engaged in protected activity.[39]  To establish a prima facie case of

retaliation, plaintiff must show that (1) he engaged in activity protected under Title VI; (2) a

reasonable employee would have found the challenged action materially adverse; and (3) a causal

nexus existed between the protected activity and the materially adverse action.  See Argo v. Blue

Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1202 (10th Cir. 2006).

        Defendant contends that plaintiff cannot show that he engaged in protected activity.  The

Court agrees.  Title VII protects individuals from retaliation for opposing a practice made unlawful

by Title VII.  See Dick v. Phone Directories Co., 397 F.3d 1256, 1267 (10th Cir.2005).  Plaintiff

claims that Behrman took adverse action against him and harassed him because he complained of

national origin discrimination.  See Pretrial Order (Doc. #43) at 11-12.  The record, however,

contains no reference to a complaint of national origin discrimination by plaintiff during the relevant

time period.[40]  In his internal grievances, plaintiff complained generally of "discrimination" and

"harassment," but he did not complain that such action was motivated by his national origin or any

other illegal motive.  On this record, plaintiff has not established a genuine issue of material fact

whether he engaged in protected activity under Title VII.  See, e.g., Anderson v. Acad. Sch. Dist.

20, 122 Fed. Appx. 912, 917 (10th Cir. 2004) (affirming summary judgment; vague reference to

"harassment/discrimination" not protected where claimant did not indicate misconduct motivated

race or other protected category).  Defendant is therefore entitled to summary judgment on plaintiff's

_____

        [39]    Plaintiff does not respond to defendant's argument that he cannot establish a prima
facie case of retaliation.

        [40]    The relevant time period is from May 27, 2004 (300 days prior to the KHRC charge)
to March 23, 2005 (the date of the KHRC charge).  Plaintiff's only complaint of national origin
discrimination occurred in the KHRC charge.  As discussed above, plaintiff cannot base his claims
on acts which occurred after his KHRC complaint unless he filed a separate administrative
complaint for those acts.  Here, plaintiff did not file a second administrative charge.

retaliation claims.

### C.    Hostile Work Environment

As noted, in the pretrial order plaintiff asserts that defendant subjected him to a hostile work environment in retaliation for his complaint of national origin discrimination.  See Pretrial Order (Doc. #43) at 11-12.  For reasons stated above, defendant is entitled to summary judgment on such claim because plaintiff did not exhaust administrative remedies and cannot establish a prima facie case.  To the extent plaintiff attempts to assert a separate, free standing claim for hostile work environment, defendant is also entitled to summary judgment.

Plaintiff may establish a violation of Title VII by proving that discrimination based on national origin created a "hostile or abusive work environment."[41]  Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986).  To establish a prima facie claim for hostile work environment under Title VII, plaintiff must show (1) that he is a member of a protected class; (2) that the conduct in question was unwelcome; (3) that the harassment was based on national origin (or some other illegal motive); (4) that the harassment was sufficiently severe or pervasive to create an abusive working environment; and (5) some basis for imputing liability to the employer.  See Harsco Corp. v. Renner, 475 F.3d 1179, 1186 (10th Cir. 2007) (sexual harassment).  To prevail under this theory, plaintiff must show (1) that the workplace was "permeated with discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of the [plaintiff's]

---

[41]     The pretrial order is unclear whether any harassment claim is based on race, religion, national origin or some other illegal motive.  In response to defendant's motion for summary judgment, plaintiff states that "[t]here is no issue that . . . the harassment was based on national origin."  Plaintiff's Response (Doc. #51) at 18.  Based on this statement, the Court analyzes the claim as one for national origin harassment.  The same analysis applies, however, regardless whether plaintiff claims that the harassment was motivated by race, religion, or some other illegal motive.

employment," and (2) that defendant subjected plaintiff to this abusive environment because of his national origin.  Herrera v. Lufkin Indus., Inc., 474 F.3d 675, 680 (10th Cir. 2007).

Defendant asserts that plaintiff cannot establish a work environment which is sufficiently severe or pervasive to be hostile or abusive.  The Court agrees.  Plaintiff must show both that the conduct to which he was subjected was "severe or pervasive enough to create . . . an environment that a reasonable person would find hostile or abusive," and that he "subjectively perceive[d] the environment to be abusive."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753 (1998).  The Court determines the existence of such an environment by looking at the totality of circumstances present in the workplace, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Id.

Plaintiff contends that the following incidents created a hostile work environment: (1) Behrman's surprise visit on April 29, 2004, when she belittled plaintiff and took over the class; (2) the faculty meeting on August 26, 2004, when Behrman snapped at plaintiff and belittled him with critical and disparaging remarks in a loud and angry voice; (3) Behrman's unannounced visit on October 10, 2004, when she was critical of plaintiff  and belittled him; and (4) Behrman's alleged interference with his final exam on December 13, 2005.  See Plaintiff's Response (Doc. #51) at 17-20.[42]  These incidents occurred over an eight-month period, and none appear to involve animus based on national origin.  Even viewed in the light most favorable to plaintiff, such conduct is not sufficiently severe or pervasive to constitute a hostile work environment.  See, e.g., Chavez v. New

---

[42]     Plaintiff does not argue that excessive work assignments resulted in a hostile work environment.

29

Mexico, 397 F.3d 826, 832 (10th Cir. 2005) (few isolated incidents of racial enmity or sporadic racial slurs insufficient); Jones v. Barnhart, 349 F.3d 1260, 1268-69 (10th Cir. 2003).

Moreover, plaintiff has not established a material issue of fact whether the alleged conduct was based on national origin.  In order to prevail, plaintiff must show that he was the object of harassment because of his national origin.  See Montes v. Vail Clinic, Inc., 497 F.3d 1160, 1170-72 (10th Cir. 2007); Bolden v. PRC Inc., 43 F.3d 545, 551-52 (10th Cir. 1994).  Plaintiff, however, points to no evidence which supports such an inference.  Because plaintiff has not established a material issue of fact in this regard, defendant is entitled to summary judgment on the hostile environment claim.

**IT IS THEREFORE ORDERED** that Defendant's Motion For Summary Judgment (Doc. #44) filed August 17, 2007 be and hereby is **SUSTAINED.**  The Clerk is directed to enter judgment in favor of defendant on all claims.

Dated this 7th day of December, 2007 at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge

30